UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HELEN SARAHI FUNES GAMEZ, | |
| Petitioner, | 25 Civ. 7429 (PAE) |
| -v- | |
| | OPINION & ORDER |
| LADEON FRANCIS *et al.*, | |
| Respondents. | |

PAUL A. ENGELMAYER, District Judge:

Shortly after 7 a.m. on September 8, 2025, petitioner Helen Sarahi Funes Gamez

("Funes"),[1] accompanied by her two-year-old U.S. citizen son and her immigration counsel,

entered 26 Federal Plaza, in lower Manhattan, for a scheduled check-in with Immigration and

Customs Enforcement ("ICE"). Funes, a noncitizen from Honduras subject to an order of

removal, had been previously released by ICE on conditions set out in an "order of supervision."

Upon checking in, Funes was immediately taken into custody by ICE, pursuant to 8 U.S.C. §

1231, and, the next day, transported to a detention facility in Louisiana in anticipation of her

removal to Honduras.

Funes here petitions for a writ of habeas corpus, pursuant to 28 U.S.C. § 2241, the All

Writs Act, 28 U.S.C. § 1651, and Article I, Section 9 of the Constitution. She argues that her

detention by respondents ("respondents" or "ICE")[2] violated the Immigration and Nationality

---

[1] In Honduras, a person typically has two surnames—the first their father's, and the second their mother's. Standard practice is to use the first surname in shorthand references. Heeding that, the Court refers to petitioner as "Funes." Hearing Transcript ("Tr.") at 33, 53.

[2] These are ICE acting field office director of New York LaDeon Francis, Secretary of Homeland Security Kristi Noem, and Attorney General Pamela Bondi.

Act ("INA"), the Fifth Amendment's Due Process Clause, and the Administrative Procedure Act, requiring her release. Funes does not directly challenge ICE's decision to detain her. Instead, she argues, ICE breached its own regulations, under which, once an authorized official determines an order of supervision ("OSUP") should be revoked, the noncitizen shall receive notice of the revocation and a prompt opportunity, through an informal interview, to respond. Had ICE followed this process, Funes argues, she had substantial arguments to make as to why her OSUP should not be revoked, including that her husband and daughter were recently granted asylum, that her own derivative asylum petition is pending, that she had yet to be scheduled for a "reasonable fear" interview, and that she had a pending Second Circuit petition challenging the order of removal. Funes later moved for emergency relief, and the Court in late October held an evidentiary hearing on her claims.

For the reasons that follow, the Court finds that the manner in which Funes was taken into custody on September 8, 2025 violated ICE's regulations and due process, and orders her immediate release. To the extent, however, that Funes seeks broader relief—including injunctive relief restricting ICE's future actions as to her—the Court denies that relief.

## I.    Procedural History

On September 8, 2025, Funes petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. Dkt. 1 (the "petition"). She alleged that during her scheduled check-in with ICE, she had been summarily informed that she would be taken into custody, without the notice or prompt informal interview that ICE's regulations require, and that, as a result, her detention violated due process. On September 9, 2025, the Court ordered ICE to answer within 60 days and not to remove Funes from the United States during this litigation. Dkt. 5.

On September 12, 2025, Funes moved for a temporary restraining order and preliminary injunction. She sought her return from Louisiana to the New York area and her immediate release from ICE custody, and restoration of the OSUP. Dkts. 7–11. That day, the Court issued an order to show cause, scheduling a hearing on Funes' petition and application for emergency relief and ordering Funes to serve respondents forthwith. Dkt. 13.

On September 19, 2025, ICE responded. Dkts. 17–19. It argued that Funes did not have a cognizable liberty interest implicating due process, and that Funes had received the notice and informal interview required by ICE regulations. Dkt. 18 at 17–24. In support, it submitted a declaration from Stephen Daniel Allport, an assistant field office director in ICE's New Orleans field office. Dkt. 19.

On September 19, 2025, Funes moved to compel ICE to facilitate her physical presence at the hearing, Dkt. 24, arguing that Allport's declaration gave rise to a factual dispute about the events of September 8 and that she had percipient testimony to give about such events, *id.* at 2. On September 30, 2025, ICE opposed that request, Dkt. 33 at 1–2, and filed a revised declaration from Allport, Dkt. 34 ("Allport Decl.").

On October 2, 2025, the Court ordered ICE to facilitate Funes' transfer to the New York area for the hearing. Dkt. 36 at 1–2. Funes' presence, the Court stated, was consistent with 28 U.S.C. § 2243 and necessary to enable the Court to evaluate her testimony and her counsel to ably represent her at the hearing. *Id.* at 2.

Between October 17 and 23, 2025, the Court conducted the hearing. Funes called: (1) herself, and (2) Livia Santoro, her immigration counsel. Respondents called Deportation Officer Kim Haynes, the ICE official who met with Funes during the September 8 check-in. Funes offered as evidence immigration records, her son's birth certificate, her marriage license,

3

and emails between her counsel and ICE.  Respondents introduced administrative records, including paperwork from Funes' file.

## II.    Background

The facts found below are based on the evidence adduced at the hearing.[3]  Where the Court states a witness's perspective on a point, it does so to convey that witness's perspective, not that the perspective itself is necessarily accurate.  Where drawn in whole or in part from a witness's testimony, the Court's findings reflect credibility determinations based on its assessment of the witness's demeanor, bias, and the extent to which the testimony was inherently logical and consistent with other evidence.

The Court found most testimony credible.  The Court found broadly credible the testimony of Santoro, Funes' immigration counsel.  Funes' testimony was generally credible, although on discrete points, it was incompatible with the record and the reasonable inferences drawn from it.  These divergences appear to have been attributable to the fast-moving events of September 8, on which Funes' testimony focused, and to her limited facility with the technical regulatory regime and procedures.  The Court found Haynes largely credible in describing his general practices, but that he had limited recall of his interactions with Funes on September 8.  To the considerable extent that his testimony about that day's events extrapolated from his general practices, and was not based on a specific recollection, it was problematic.

### A.    Arrival in and Deportation from the United States

Funes is a citizen and national of Honduras.  GX N at 9.  On June 9, 2004, at age 10, she and her mother, Ana Iris Gomez Pascual, entered the United States at Brownsville, Texas

---

[3] Petitioner's exhibits are cited as "PX"; respondents' exhibits as "GX"; and the transcript of the hearing as "Tr."  The Court also received as court exhibits the parties' closing argument slides. *See* Dkt. 49.

without inspection or permission. GX A–D; Tr. at 73–74. The two were intercepted by U.S. immigration officials and spent one day in ICE[4] custody. *Id.* at 74. The next day, ICE released them with a notice to appear telephonically at hearing before an immigration judge. GX A. On November 4, 2004, after Funes and her mother did not appear at this hearing, Funes was ordered removed *in absentia* by Glenn P. McPhaul, an immigration judge in San Antonio, Texas (the "final removal order"). GX A. The final removal order found that Funes had notice of the hearing and was to "be removed from the United States to Honduras." *Id.* at 2 (cleaned up). That same day, a warrant for Funes' removal was issued by ICE's field office in Harlingen, Texas. GX B.

On November 18, 2004, the final removal order was mailed to Funes at her last-documented address in Holyoke, Massachusetts. GX A at 3; GX C. An accompanying letter from ICE stated that the decision was final, "unless a motion to reopen" was filed in accordance with the governing statute. *Id.* at 3 (cleaned up). No such motion was filed. GX D; Tr. at 76. On December 30, 2004, ICE mailed Funes a notice stating that arrangements had been made for her to be deported to Honduras on January 31, 2005. GX D. On or around January 11, 2005, that notice was returned to ICE as undeliverable. *Id.* On June 22, 2006, a warrant for Funes' removal was issued by ICE's Boston field office. GX E.

---

[4] Before 2002, immigration proceedings were conducted by the Immigration and Naturalization Service ("INS"). In 2002, after passage of the Homeland Security Act, removal authority was transferred from INS to the Secretary of the Department of Homeland Security ("DHS"), which came to include ICE. *Ali v. Mukasey*, 524 F.3d 145, 150 (2d Cir. 2008). For ease of reference, the Court generally refers to ICE and its predecessors—*e.g.*, INS or DHS—as ICE. In analyzing the delegation of authority from DHS to ICE or other entities, however, the Court distinguishes between these immigration authorities.

On June 7, 2009, when Funes was age 15, a state trooper stopped a vehicle she was in near Clintonville, Pennsylvania. Allport Decl. ¶ 12[5]; Tr. at 76–77. After determining that the passengers were not fluent in English, the trooper sought assistance from border patrol officials. Allport Decl. ¶ 12. Funes and the other passengers were taken to a state police facility. *Id.* Funes was found subject to the final removal order and processed for removal as an unaccompanied minor. *Id.* On June 8, Funes was transferred to ICE custody and taken to a detention center at Boystown, near Miami, Florida. *Id.* ¶ 13. She was held there until August 7, 2009, when she was deported to Honduras. Tr. at 77; GX G.

### B.    Return to the United States

On May 21, 2023, Funes, her husband, and her daughter, age three, entered the United States at Eagle Pass, Texas without inspection or permission. Dkt. 9-1; Tr. at 71–72, 78; PX 4; GX N at 11. Funes was pregnant with her son.[6] Tr. at 71; PX 3. Funes and her family were intercepted by a border patrol agent, who determined that they had unlawfully entered through Mexico and were Honduran citizens with no right to be in the United States. Dkt. 9-1 at 2–5. Upon apprehension, Funes claimed to fear returning to Honduras, where she had received and reported to law enforcement threats from certain political actors. Tr. at 99–100. Funes and her family were arrested and transported to Laredo, Texas for processing by ICE. Dkt 9-1 at 4.

---

[5] Funes argues that the Court should not rely on the Allport Declaration, Dkt. 34, because she did not have an opportunity to cross-examine Allport. Tr. at 13–14. The Court does not rely on that declaration to the extent it recounts the events of September 8, as to which Allport was not a percipient witness, and as to which the Court heard testimony from ICE official Haynes. To the extent, however, that the declaration recounts—and attaches records of—Funes' historical interactions with INS, its accuracy appears undisputed, and the Court draws upon it.

[6] Funes' family today consists of her husband, daughter (age 5), and son (age 2). Funes' son was born August 14, 2023 and is a U.S. citizen. PX 3. On February 20, 2025, Funes' husband and daughter were granted asylum by Immigration Judge Thomas Mungoven. PX 5.

On May 23, 2023, due to overcrowding at the detention facility, Funes and her family were released on humanitarian grounds. *Id.* Upon release, Funes was served with a warrant for her removal, a notice that her final removal order would be reinstated, a warning that she was prohibited from entering, attempting to enter, or being in the United States, and the OSUP. Tr. at 78, 80; GX G–J.[7]

Salient here, Funes' OSUP permitted her to remain in the United States, pending her removal, subject to conditions. Tr. at 57.[8] It required that Funes: "[a]ppear in person at the time and place specified, upon each and every request of the agency. . .for deportation or removal"; "not commit any crimes"; and "provide information under oath about [her] nationality, circumstances, habits, associations and activities." PX 1 at 2. It also required that Funes be subject to electronic monitoring. PX 2; Tr. at 57. Funes agreed to "report" regularly to ICE on a government-issued device, take a photograph of herself every Wednesday, and check-in with immigration officials as directed. Tr. at 57–58. Funes understood that ICE could require her to check-in at any time. *Id.* at 144 (Santoro).

Funes undisputedly complied with these conditions. Her first check-in was on July 7, 2023, at 26 Federal Plaza; her 2023 and 2024 check-ins were typically every several months. GX J at 58–59.

---

[7] The warrant (ICE form I-205) stated that Funes remained subject to immediate deportation and could be taken into custody by any immigration officer. GX I. The notice of reinstatement (ICE form I–871) stated that Funes was "subject to removal by reinstatement of the prior order," could "contest this determination by making a written or oral statement to an immigration officer," and had declined to make a statement contesting the determination. GX G. The warning form (ICE form I–294), stated that Funes was prohibited for 20 years "from entering, attempting to enter, or being in the United States," because her 2023 illegal entry had caused her prior removal order to be reinstated. GX H.

[8] Because Funes' husband and daughter did not have final removal orders, they were released on their own recognizance pursuant to INA § 212(a)(6)(A)(i)(I). Dkt. 9-1 at 4.

The check-in immediately before September 8 was on July 14, 2025. Tr. at 114. At that check-in, Funes, accompanied by Santoro, was told by a female ICE officer that she would be detained. *Id*. at 123. Santoro responded that there were no changed circumstances in Funes' case; that Funes was in compliance with the OSUP; that Funes had a pending asylum petition (an "I-730"); that Santoro intended to file for a stay of removal proceedings on Funes' behalf; and that Funes had a reasonable fear interview yet to be scheduled. *Id*. at 123–24.[9] The ICE officer relented and rescheduled Funes to meet with ICE at a later date. *Id*. at 124. That same day, Santoro, at 26 Federal Plaza, submitted Funes' application for a stay of removal proceedings, which included Funes' Honduran passport (the "stay application"). *Id*. at 115, 136.

On July 21, 2025, Santoro emailed ICE, seeking an update as to the stay application and attaching new materials in support. These materials reported that the asylum petition by Funes' husband and daughter had been granted, PX 8 at 8, and included supporting letters and an expert evaluation of Funes' asylum claim. Tr. at 143. Santoro never received a response to, or acknowledgement of, the July 21 email. *Id*. at 143–44. Between July 25 and August 1, 2025, Santoro sent further emails to ICE, seeking a status update on the stay application. PX 8 at 6–8.

On September 3, 2025, Funes, with Santoro, arrived for a scheduled check-in at 26 Federal Plaza, but was turned away because ICE had reached its daily check-in capacity. Tr. at 125. At 7:53 a.m., after Funes was denied entry, Santoro emailed ICE, stating that she and Funes were outside but unable to enter. PX 8 at 3. At 9:28 a.m., Haynes replied via email,

---

[9] A reasonable fear interview permits a noncitizen, before removal, to raise concerns regarding her return to the country to which she has been ordered removed. Tr. at 146, 165–66. If a "positive determination," is made after an interview with a U.S. immigration official, the noncitizen is placed in proceedings that forestall deportation. *Id*. at 146. If the official does not find a reasonable fear of persecution or torture, the noncitizen receives a "negative determination." In such cases, the noncitizen may appeal the negative determination for review by an immigration judge. *Id*.

stating that Funes should report to 26 Federal Plaza on September 8, 2025. *Id.* at 2. At 9:31 a.m., Santoro replied, seeking an update on the stay application. *Id.* At 11:25 a.m., Haynes replied that Santoro's inquiry "will be forwarded to the docket officer." *Id.* Santoro also went to the 9th floor of 26 Federal Plaza—where she had filed the stay application—seeking a status update. She was told the "stay was in the system and that it was still pending." Tr. at 115.

### C.    September 8, 2025 Check-In

On September 8, 2025, at around 6:30 a.m., Funes, her two-year-old son, and Santoro arrived at 26 Federal Plaza. *Id.* at 59. At 7 a.m., they were let in and went to the 5th floor. *Id.* at 59, 82. Funes entered a conference room with her son (the "family waiting room"), while Santoro waited in the hallway. *Id.* at 82, 159–60.[10]

The family waiting room has chairs for noncitizens and their families. At a front table, some 12–15 feet from the chairs, an ICE officer waits to meet with noncitizens. *Id.* at 82, 162. The officer has a computer and can access ICE records. *Id.* at 84. While in that room, a noncitizen is permitted to keep her personal belongings, including a cell phone, with her. *Id.* at 92.

The three hearing witnesses testified about Funes' September 8 check-in and the ensuing events. The Court summarizes the account of each witness before setting out its findings of fact.

#### 1.    Funes' Testimony

***Funes' check-in***: The check-in began with Haynes calling Funes' name. *Id.* at 59. She went to the front of the family waiting room, sat in front of a desk, and set her son in the chair beside her. *Id.* Across the desk was Haynes. *Id.* at 84. Funes told Haynes she had an attorney

---

[10] Due to limited space, attorneys are not permitted to wait in the family waiting room. Tr. at 160. When a noncitizen is called forward, the noncitizen proceeds to the front of the room. If she tells the ICE officer she has an attorney, the attorney then joins the check-in. *Id.*

and Santoro was notified the check-in was beginning. *Id.* Before Santoro arrived, Haynes asked Funes if she spoke English and Funes said yes. *Id.* at 59–61. Haynes then asked her "if [she] wanted to go home or if [she] want[ed] to be detained." *Id.* at 59. Funes replied: "[W]hy? I want to go home." *Id.* Haynes clarified that his question meant, "home, but in Honduras." *Id.* at 59–60.

Funes began crying: "I was in shock." *Id.* at 60–61. She told Haynes that "it was going to be hard for [her]," and that she had a reasonable fear interview that was yet to be scheduled. *Id.* at 60. Haynes replied that Funes could have a reasonable fear interview while detained. *Id.* Haynes then asked Funes whether she wanted to keep her son with her in detention, noting that the family detention centers were in Houston, Texas, or contact someone to pick up her son. *Id.* Haynes stated that, if Funes were detained alone, she would be moved to New Jersey or Pennsylvania. *Id.* Funes texted her husband stating that she would keep her son with her, but quickly changed her mind—telling her husband "no, just come and get my son." *Id.* at 60–61.

Santoro then arrived at the table. She asked Haynes why Funes was being detained. *Id.* at 61. Haynes replied that "anybody with a final . . . removal order was going to be detained that day." *Id.* He added that "there was a new [P]resident." *Id.* at 109. Santoro responded that Funes had pending a reasonable fear interview, a stay application, and a derivative asylum application based on her husband's successful asylum petition. *Id.* at 61–62. Haynes then told Funes that the stay application had been denied. *Id.* at 62. Santoro said that Funes had been complying with the OSUP and that there were no changed circumstances. *Id.* at 87–88. She asked that Funes be given a week to decide whether to keep her son with her in detention; Haynes answered no. *Id.* at 62. Haynes said he would make a note of Funes' pending

reasonable fear interview. *Id.* at 89. The conversation lasted 15–20 minutes. *Id.* at 108. At the end, Funes again contacted her husband to come collect their son. *Id.* at 62.

At no point, including when Santoro asked why Funes was being taken into custody, did Haynes say that the OSUP was being revoked. *Id.* at 62, 85, 90. Haynes never told Funes that she had violated any condition of the OSUP. *Id.* at 58. Funes did not recall Haynes saying during the check-in (as he later testified) that, since the last check-in, ICE had obtained a copy of Funes' Honduran passport, which enabled ICE to imminently remove her to Honduras. *Id.* at 85.

***Ensuing events***: Around 10:30 a.m.,[11] Santoro left to meet Funes' husband in the lobby of 26 Federal Plaza. *Id.* at 62. When the two returned to the family waiting room, Funes told her husband she was going to be detained. *Id.* at 63. At 11 a.m., Funes gave her son to her husband, who left with Santoro. *Id.* Funes remained. *Id.* at 91. Haynes later approached Funes, asked if she wanted anything to eat, and gave her water and chips. *Id.* Funes was then taken to an adjacent room, patted down, and handcuffed. *Id.* at 63, 93. Between 11:30 a.m. and noon, Funes was taken to the 10th floor, which has holding cells, the door to each of which had a see-through window. *Id.* at 63, 65. Funes' handcuffs were removed, and she was placed in a cell with another woman. *Id.* at 63–64, 101. Men were detained in the adjoining cells. *Id.* at 64.

Funes was twice briefly removed from the cell. First, a nurse took her to perform DNA and pregnancy tests. *Id.* Later, around 6:40 p.m., Haynes removed Funes. *Id.* at 101. The two sat outside the cell, with Funes on a bench near the desk where Haynes and another officer were working on computers. *Id.* at 104. Haynes gave Funes her phone. *Id.* at 64, 94. Funes called her husband and spoke for about 10 minutes. *Id.* at 93. She sent Santoro a WhatsApp audio

---

[11] Funes based the timing of events in the family waiting room based on her memory of the time displayed on her phone, which was in her possession while there. Tr. at 63–64, 83.

message saying she was about to be fingerprinted and would be transferred the next day. *Id.*

at 64–65. Funes was then fingerprinted and returned to her cell, without her phone. *Id.* at 65,

105.

Some 15 to 20 minutes after Funes returned to her cell, Haynes tapped on the window to

the cell. *Id.* at 65–66. Without unlocking the door, Haynes, without comment, slid a paper titled

"Notice of Revocation of Relief," which Funes identified as GX K (the "Notice"), under the

door. Haynes then left. *Id.* at 66–68, 109. The Notice stated:

> This letter is to inform you that your order of supervision has been revoked and you
> will be detained in the custody of U.S. Immigration and Customs Enforcement
> (ICE) at this time. This decision has been made based on a review of your official
> alien file and a determination that there are changed circumstances in your case,
> specifically that ICE has procured a travel document on your behalf and your
> removal is now imminent.
>
> ICE has determined that you can be expeditiously removed from the United States
> pursuant to the outstanding order of removal against you. On November 4, 2024,
> you were ordered removed to Honduras by an authorized U.S. DHS official and
> you are subject to an administratively final order of removal.
>
> Based on the above, and pursuant to 8 C.F.R. 241.4 / 8 C.F.R. 241.13, you are to
> remain in ICE custody at this time. You will promptly be afforded an informal
> interview at which you will be given an opportunity to respond to the reasons for
> the revocation. If you are not released after the informal interview, you will receive
> notification of a new review, which will occur within approximately three months
> of the date of this notice.

Notice at 1.

Reading the Notice, Funes understood, for the first time, that "the supervision was going

to be taken away." Tr. at 66. Funes was never given an interview at which she had an

opportunity to respond to the Notice. *Id.* at 111. Funes spent the night in the cell. *Id.* at 68.

On September 9, around 7 a.m., Funes was removed from the cell, cuffed at her wrist and

ankles, and transported to New Jersey. *Id.* There, she boarded a plane to Louisiana, where she

was housed in the Richwood Correctional Facility in Monroe, Louisiana. *Id.* at 68, 95.

### 2.    Santoro's Testimony

***Funes' check-in***:  Funes' check-in began around 8:20 or 8:30 a.m.  *Id*. at 113.  Santoro

joined Funes and Haynes, who were at the table in the family waiting room.  *Id*. at 149.  When

Santoro arrived, Funes was crying.  *Id*. at 114.  Haynes stated that Funes would be detained,

"because she had a final removal order" and "all the people with final removal orders would be

detained that day."  *Id*.  Santoro responded that there had not been any change to Funes'

circumstances and that Funes had pending a derivative asylum petition, based on her husband's

successful asylum petition,[12] and a reasonable fear interview.  *Id*.  Santoro noted that Funes did

not have a criminal history.  *Id.* at 114, 128.  Haynes responded by giving the following reasons

for Funes' detention: "[A]ll people with final removal orders would be detained" and "[t]here

was a new [P]resident."  *Id*. at 145.  Haynes did not state any other reason for Funes' detention.

*Id*. at 119.

Santoro then asked about the status of the stay application.  *Id.* at 114.  Haynes stated that

it had been denied, and that the denial had been mailed to Santoro.  *Id*. at 115.  Haynes gave

Santoro a copy of the denial, dated August 14, 2025.  *Id*.  Santoro told Haynes she had been

advised to the contrary as recently as September 3, 2025, when an official on the 9th floor of 26

Federal Plaza had told her the "stay was in the system and that it was pending."  *Id*.

Santoro asked where Funes would be detained.  *Id*. at 117.  Haynes stated that if Funes'

son stayed with her, they would be detained in a family detention center in Texas, but otherwise,

---

[12] Santoro and Haynes expressed conflicting understandings about whether Funes is eligible for
derivative asylum, which a noncitizen with a family relationship to a successful asylee may seek.
Santoro testified that Funes is eligible and, were her asylum petition granted, Funes would be
permitted to stay in the United States. Tr. at 148. Haynes testified that a noncitizen subject to a
final order of removal is categorically ineligible for derivative asylum. *Id*. at 168. The Court
does not have occasion to resolve this question here.

if she was alone, she would be detained in Pennsylvania, New Jersey, or Long Island. *Id.*

Santoro stated this was an important decision and requested that Funes be given a week to

decide. *Id.* Haynes said no. *Id.* Santoro conferred with Funes, who contacted her husband to

come retrieve their son. *Id.* Santoro told Haynes that Funes' husband would pick up their son.

*Id.* at 133. Santoro did not recall Haynes saying that ICE had a travel document for Funes, that

this was the reason for Funes' detention, or that the OSUP was being revoked. *Id.* at 136.

Santoro was not given any document relating to Funes' detention. *Id.* at 154.

At some point, Santoro briefly left to meet Funes' husband in the lobby and brought him

to the 5th floor. *Id.* at 117. She did not have contact with ICE about Funes during this period.

*Id.* Funes told Santoro that no ICE officer spoke with her while Santoro was away. *Id.* at 117–

118. After Santoro returned, Haynes gave Funes forms regarding her children's care: one

designated a caregiver during her detention; another covered deportation. *Id.* at 118.

**Ensuing events**: Around 11 a.m., Santoro left 26 Federal Plaza with Funes' husband and

son. *Id.* at 119. Santoro then texted Funes multiple times. *Id.* at 135. At 1:03 p.m., Santoro

emailed ICE, stating that Funes had been detained, seeking her "immediate referral" for a

reasonable fear interview, and requesting a legal call with Funes. PX 7 at 1–2. At 2:12 p.m.,

Santoro received a reply from ICE's "New York Outreach" stating, "our records do not indicate

that the subject is in custody." *Id.* at 1. Ten minutes later, Santoro received another email,

stating, "[o]ur records do not indicate that this subject is NOT in ICE custody." *Id.* At 6:41

p.m., Santoro received a voice memo from Funes, stating that she was about to be fingerprinted

and would be transported the next day to another ICE facility. Tr. at 121–22. Santoro never

received a copy of the Notice that Funes was given on the night of September 8. *Id.* at 153.

### 3.    Haynes' Testimony

Haynes testified to his general practices as well as his recollections of the events of September 8. Because Haynes, at times, relied on his general practices, as opposed to a specific recollection of what occurred on September 8, in testifying about those events, the Court begins with these general practices.

***General practices***:  On a "typical" day Haynes meets with 10–13 noncitizen families. *Id.* at 160. During these check-ins, he checks paperwork to determine whether the families are in compliance with their OSUPs, whether there are pending removal orders, and whether the noncitizens have any criminal history. *Id.* His review of a noncitizen's file occurs while he is asking "follow-up questions" and generally takes 15 to 20 minutes. *Id.* at 289–90. As of this point, Haynes has not spoken to his supervisor, has not been advised that a noncitizen's OSUP can be revoked. He will not state that a noncitizen's OSUP has been revoked until he has obtained supervisory approval. *Id.* at 290. If Haynes sees in the file a final order of removal and "a travel document for [the noncitizen] to be removed out of the country"—or if he sees that the noncitizen has committed a crime—Haynes understands the noncitizen's OSUP may be revoked. *Id.* at 169. In this situation, Haynes' general practice is to contact a supervisor, who, in turn, contacts the assistant field office director. *Id.* at 161–62. "Once the assistant field office director gives the ok" to Haynes' supervisor, that supervisor alerts Haynes "to revoke their OSUP and take them into custody." *Id.* at 162. Haynes tells a noncitizen that she is going to be detained only "after [he] get[s] confirmation from [his] supervisor." *Id.* at 188.

Before a noncitizen is taken into custody, Haynes sometimes conducts "an informal interview" with her. *Id.* at 169–70, 188. He starts by stating that she "will be taken into custody" and that her OSUP will be revoked. *Id.* at 189. "[N]ormally" at this point, Haynes

"starts typing whatever statements" the noncitizen makes. *Id.* at 226. Haynes does so to assess "if there is anything that would affect them being taken into custody." *Id.* at 188. According to Haynes, a noncitizen subject to a final removal order might not be taken into custody: if ICE did not possess a travel document required to effect removal; if there was a pending stay application; or if the noncitizen had "something pending within the Second Circuit." *Id.* at 186–187, 219. Haynes reports his findings to his supervisor verbally and in writing on a form titled "Alien Informal Interview." *Id.* at 226, 276–77. Haynes' supervisor then contacts the assistant field office director, who makes the ultimate decision whether to revoke an OSUP. *Id.* at 188.

***Funes' check-in***: On September 8, Funes' papers were among those Haynes was assigned to review during the scheduled check-in. *Id.* at 191. When it was Funes' turn to meet with Haynes, Funes went to retrieve Santoro from the hallway and brought her to the table where Haynes was waiting. *Id.* at 192. At no point was Funes alone with Haynes at his desk before Santoro joined, and Haynes did not say anything to Funes outside of Santoro's presence. *Id.* at 192, 310. Before Funes reached his desk, Haynes had not reviewed her file with anyone— including his supervisor. *Id.* at 277. When Santoro and Funes arrived, Funes gave him a copy of her OSUP so that he could record the check-in on it. *Id.* at 200. Haynes then "ran the. . . normal checks" to determine whether Funes was "detainable or to be taken into custody or to give a next report date." *Id.* at 192. When Haynes saw that Funes had a final order of removal, that her child who had received asylum was not present, and that she had a travel document "on file," he stepped away to confer with his supervisor, Christopher C. Finnie, in an office 15–20 feet away. *Id.* at 192–93, 287; PX 8 at 6.

Finnie advised Haynes that Funes "could be taken into custody and the order of supervision revoked." Tr. at 222–23. Haynes then told Funes and Santoro, "Your order of

supervision is going to be revoked, and you are going to be taken into custody." *Id.* at 223. Haynes told them that the fact that ICE had a copy of Funes' Honduran passport "was the reason" the agency was now "revoking the order of supervision." *Id.* at 220.

Haynes then conducted an "informal interview" with Funes; at this point, Funes was not yet "a detainee." *Id.* at 158–59, 225, 270. Funes said "she wanted to have her reasonable fear interview done," and understood it would be done while she was detained. *Id.* at 225. Santoro noted that Funes had "a U.S. citizen-born child." *Id.* at 231. Haynes asked if someone could "pick up her child"; Funes said her husband could. *Id.* Funes and Santoro noted that Funes had complied with the OSUP. Haynes stated that compliance alone does not prevent ICE from taking a noncitizen into custody. *Id.* at 220. Funes and Santoro noted that Funes had a pending stay application. *Id.* at 223. Haynes responded that the stay application had been denied on August 14, 2025, and asked if they had received the denial letter. *Id.* at 204, 218. Haynes did not recall their response; he printed out the denial letter, GX O, and gave it to Santoro. *Id.* at 204. The letter stated that based on Funes' "immigration history, including her children," and "the assertions made in [the stay application]," there are "no compelling reasons to warrant a favorable exercise of discretion in his [sic] case." GX O; Tr. at 217–18.[13] It added that "there is no administrative appeal from this decision," and directed inquiries to "Deportation Office Lee." GX O. It stated that it had been approved, on behalf of the acting field office director, by the acting deputy field office director. Tr. at 218–19.

Haynes "wrote down whatever [Funes] said" during this informal interview; he did not write down Santoro's statements because the form "only asks for the alien's response, not the

---

[13] Haynes acknowledged that the letter errantly referred to Funes as male ("his case"). Tr. 217–218.

attorney's response." *Id.* at 272.  Haynes entered her statement that "I would like to leave my kids with my husband" on an "Alien Informal Interview" form, GX L.  Haynes started to fill out this form while Funes and Santoro were "waiting for [Funes'] husband" but completed it later. Tr. at 230–31.  Haynes there wrote:

> On 09/08/2025, I conducted an initial informal interview of the detainee listed above in order to afford the alien an opportunity to respond to the reasons for revocation of his or her order of supervision stated in the notification letter.  At the interview, the alien made the following oral response regarding the reasons for revocation:  I would like to leave my kids with my husband and have a reasonable fear interview.  I understand I will be detained and receive the interview, and my husband will pick my US citizen child up.

GX L.  Haynes then left to convey Funes' statements to Finnie.  *Id.* at 308, 325.

Haynes then gave Funes four forms: one stating that she would be arrested and had the option to be reunited with her children upon deportation; one designating a caregiver during her detention; one enabling participation in a detainee locator; and one setting out her rights under the Vienna Convention on Consular Relations.  *Id.* at 232–33.  Funes signed the latter two in Santoro's presence.  *Id.* at 233.

Confronted with the statements attributed to him by Funes and Santoro, Haynes could not recall whether he had stated that "all individuals with final orders of removal or reinstated orders of removal would be detained" that day, or that "people are being detained because there is a new [P]resident now."  *Id.* at 186–88, 313–14.  Haynes did not recall whether Funes was crying at any point.  *Id.* at 310–11.

***Ensuing events***:  After Santoro and Funes' husband and son left, Funes remained in the family waiting room while Haynes "continued checking in other aliens."  *Id.* at 237.  Haynes gave Funes a hot meal and water.  *Id.* at 233, 237.  Haynes generally gives noncitizens hot meals once they are "upstairs on the tenth floor" but he treats "family detainees differently," and so

gave Funes the meal while on the 5th floor. *Id.* at 237. At some point after 1 p.m., Haynes took Funes to a side room, handcuffed her, and then took her to the 10th floor, removed the cuffs, placed her in a cell, and returned downstairs "to finish up the paperwork." *Id.* at 233, 244–45.[14]

Around 4 p.m., Haynes began typing up Funes' paperwork. It included a "proof of service," stating that "at 1600 [4:00 p.m.]" Haynes served Funes with "a copy of" the Notice. Notice at 2. That was inaccurate—Haynes was then still preparing that notice. Tr. at 248. At some point, while he was processing documents on a computer near Funes' cell on the 10th floor, Haynes gave Funes her phone and told her to write down the numbers she called. *Id.* at 245–46. Funes told Haynes she called her husband. Haynes stated that he did not overhear Funes' call because she was "not on speakerphone" and spoke in "her native language." *Id.* at 246.

After 7:50 p.m., Haynes received an email attaching a digitally signed copy of the Notice, GX K, revoking the OSUP. *Id.* at 267. Haynes printed out the Notice, went to Funes' cell, opened it using a key, and handed Funes the Notice. *Id.* at 249–50, 265, 267. Haynes "said something" to Funes but didn't recall what. *Id.* at 268–69. Haynes had not previously given the Notice to Funes (or Santoro). *Id.* at 256.

The Notice was signed by acting assistant field office director Hakeem Folajaiye, whom it errantly identifies as "acting field office director." *Id.* at 247–48. The Notice, according to Haynes, substantially tracks what he had orally told Funes and Santoro: that Funes would be taken into custody; and that that decision was based on ICE's having obtained a travel document

_____

[14] Haynes initially testified that the fact the detainee locator at 2:22 p.m. had not listed Funes as being in custody meant she was then still on the 5th floor. Tr. at 239. He later withdrew this testimony, stating that the locator might update 4–6 hours later "depending on staffing" and "what's going on" and that Funes might have reached the 10th floor by 2:22 p.m. *Id.* at 295–96.

for her. *Id.* at 251–53. Contrary to the statement on the Notice that Funes would "promptly be afforded an informal interview," Funes did not thereafter have such an interview. *Id.* at 261.

### 4.    Findings of Fact

As the above reflects, although there is accord on some points, on others, the witnesses' accounts differ, with Funes and Santoro's diverging materially from that of Haynes. The areas of factual conflict centrally bear on whether ICE complied with its regulations in revoking Funes' OSUP. As developed below, these regulations require that the noncitizen shall receive notice of the revocation and a prompt opportunity, through an informal interview, to respond; and that the revocation be approved at a defined supervisory level. In particular, the witnesses differ as to the reason(s) Haynes stated as to why ICE was taking Funes into custody; whether Haynes stated that Funes' OSUP was being revoked; and whether Funes, upon revocation, was given an informal interview to respond to ICE's reasons for revoking her OSUP. The findings below focus on the most salient facts and areas of material disagreement.

1.    ***Haynes' statement to Funes that she was being detained***:  The Court finds that the check-in began around 8:30 a.m. in the family waiting room, when Haynes called Funes to his desk and told her she would be detained. The Court finds that Haynes conveyed this to Funes before Santoro arrived. That finding is supported by Funes' credible testimony as to the words Haynes used. She recalled that he asked her whether she wanted to go "home," only to clarify that "home" meant Honduras. It is also supported by Santoro's credible testimony that when she arrived at Haynes' desk, Funes was already there and crying. Haynes' assertion that he did not communicate with Funes before Santoro arrived is not credible. It is undercut by the indistinctness of Haynes' memories of his dealings with Funes that day; by his inability to recall whether Funes, at any point during the check-in, was crying, which the Court finds she clearly was; and by Funes and Santoro's credible account that Santoro was summoned to Haynes' desk

20

after the check-in began as opposed to being retrieved by Funes before Funes sat down with Haynes.

2. ***Haynes' statements about the OSUP***:  The Court finds that although Haynes' predominant message to Funes was that she would be detained, at some point, he likely did verbally tell her that the OSUP was being revoked.  The Court credits Haynes' testimony that his consistent practice was to say so.  It also logically follows that, if Funes were being taken into custody to affect her removal, the OSUP was being revoked.  It is credible that Funes, who denied hearing such a statement, was focused on the statement that she was being detained, not on procedural formalities.  The Court, however, credits Santoro's firm testimony that Haynes, in her presence, did not state that the OSUP was being revoked.  Santoro, as an attorney, would have alerted to such a statement.  The Court finds it most likely that, before Santoro arrived at Haynes' desk, Haynes told Funes that the OSUP was being revoked.

3. ***Reasons for revoking the OSUP***:  As to the reasons that Haynes articulated during the check-in for Funes' detention, the Court credits the testimony of Funes and Santoro. The Court finds that Haynes stated that "anybody" with a final order of removal would be detained that day.  The Court further finds that he attributed the decision to detain Funes to the fact that there was a "new [P]resident."  Funes and Santoro credibly—and emphatically— testified to this effect and their testimony was consistent.  And Haynes, tellingly, did not deny making such statements—only that he did not recall doing so.  The Court further finds that Haynes likely did not communicate to Funes and Santoro that the decision to detain Funes was based on ICE's having come into possession, since Funes' prior check-in, of her Honduran passport, which served as a changed circumstance to render her removal imminent.  Although not expressed to Funes and Santoro, the Court finds that, in fact, ICE's acquisition of Funes'

passport was the basis for ICE's decision on September 8 to detain her. Without such a document, ICE was unable to deport Funes. The Court credits Haynes' testimony that he mentioned the passport to his supervisor, Finnie, as the basis to revoke the OSUP. But Haynes' testimony that he so stated to Funes and Santoro was less confident. In contrast, Santoro credibly and forcefully testified that Haynes, in explaining Funes' detention, did not refer to the passport.

　　　　4.　　***Supervisory approval to revoke the OSUP***: The Court finds that Haynes secured the approval of his supervisor, Finnie, to detain Funes. There is no basis to conclude that Haynes was acting without Finnie's approval. There was, however, no competent evidence that any ICE official superior to Finnie had approved the revocation as of the end of Funes' check-in. The only evidence of further approval is Folajaiye's 7:50 p.m. signature on the Notice, which Haynes first prepared in late afternoon and thereafter gave to Funes sometime after 7:50 p.m. As to the timing of Finnie's approval, the Court does not credit Haynes' testimony that, to secure this approval, he stepped away from the desk in the family waiting room, walked to Finnie's office, waited for Finnie to secure approval from the acting field office director, and then returned to Funes and Santoro to communicate that Funes would be detained. Neither Funes nor Santoro attested to any break in their conversation with Haynes. And Haynes' unequivocal statement to Funes at the start of the check-in that she would be detained connotes that Haynes had already secured supervisory approval of that decision. Haynes in describing his general practices, notably did not describe a practice of departing from the family waiting room mid-check-in to confer with a supervisor about whether to detain a noncitizen.[15]

---

[15] That step was absent from Haynes' direct testimony, which carefully elicited his general practices, including his consultation with supervisors during the revocation of an OSUP. It was

5.      ***Funes' statements to Haynes***:  The Court finds that, after Haynes told Funes she would be detained, she made a series of statements, and that Haynes memorialized a subset of these statements in a memo he completed afterwards titled "Alien Informal Interview."  These statements included that Funes would like to leave her children with her husband and have a reasonable fear interview.  The Court so finds based on the consistency between Haynes' testimony, statements recorded in the memo, and statements that Funes and/or Santoro acknowledged making during Funes' check-in.  Haynes characterized the encounter in which Funes made these statements as an "informal interview."  The Court takes up that characterization later, in its discussion of Funes' claims.

6.      ***Communication of the stay application denial***:  The Court finds that Funes and Santoro were first notified during the check-in on September 8 that Funes' stay application had been denied.  Funes and Santoro credibly so testified.  That testimony is corroborated by Santoro's written request to ICE, at 9:31 a.m. on September 3, 2025, for an update on the stay application, which went unanswered, and by the date (September 3, 2025) alongside the final signature on the letter denying the stay application.  PX 8 at 1–2; GX N at 1.

7.      ***Funes' status and movements while in 26 Federal Plaza***:  The Court finds that, once Haynes unequivocally told Funes during the check-in that she was being detained, Funes was not free to leave.  That message was reinforced by Haynes' denial of Santoro's request for Funes to return after one week.  Santoro's 1:03 p.m. email stating that her client had been detained "this morning" is in accord.  The Court further finds that, by 1:03 p.m. at the latest, Funes had been transported to the 10th floor and placed in a cell.  That finding is supported by

---

not until the Court pressed Haynes on the point that he recalled stepping away—not once, but twice—from Funes and Santoro to secure such approval on September 8.  Tr. at 287–88.

Funes' testimony that between 11:30 a.m. and 12:00 p.m. she was handcuffed and moved; and by Santoro's request for a legal call with Funes at 1:03 p.m., because Funes, by then, no longer possessed her cell phone, which Santoro had repeatedly messaged.

8.      ***Written notice of revocation***:  The Court finds that Funes was first given written notice of the revocation of the OSUP after 7:50 p.m. on September 8, when Haynes gave Funes, then in her 10th floor cell, the Notice.  The Court finds, as Haynes acknowledged, that the "proof of service" inaccurately stated that Funes had been served with that Notice at 4 p.m. that day. There is no need to resolve whether Haynes slipped the Notice under Funes' cell door, as Funes testified, or opened the cell door and handed it to her, as Haynes testified.

9.      ***Absence of an informal interview following the Notice***:  The Court finds that, after Haynes delivered the Notice to Funes on the night of September 8, no official from ICE interviewed Funes or gave Funes (or her counsel) an opportunity to respond to that decision. ICE also never provided a copy of the Notice to Santoro.  These points were undisputed.

## III.    Discussion

Funes argues that her detention on September 8 did not comply with ICE's regulations governing the revocation of OSUPs, that these lapses (including the denial of an opportunity to be heard after notice of the revocation) violated her due process rights, and that the appropriate remedy is her release from ICE custody.  The Court first assesses whether ICE complied with its regulations, then considers whether ICE's lapses amounted to a due process violation, and, finally, considers the appropriate remedy.

At the outset, the Court notes that Funes' petition and her emergency application are substantially coterminous.  They claim the same violations and seek substantially the same

remedies.  That is not uncommon among immigration habeas petitions.  *See, e.g.*, *Mahdawi v. Trump*, 136 F.4th 443, 446–47 (2d Cir. 2025).  The Court, therefore, resolves these together.

### A.    Did ICE Breach Its Regulations?

#### 1.    Requirements of 8 C.F.R. § 241.4(*l*)

Section 241(a) of the INA, codified at 8 U.S.C. § 1231(a), sets out the procedures for removing and detaining a noncitizen who is subject to a final order of removal.  *See Johnson v. Arteaga-Martinez*, 596 U.S. 573, 575–76 (2022).  It "applies to individuals who are removed and who then reenter without authorization and apply for withholding of removal based on a fear that they will be persecuted or tortured if returned to their countries of origin."  *Id.* at 576.

Under § 1231(a)(2)–(3), a noncitizen subject to a final order of removal may be detained for a certain amount of time, § 1231(a)(2), or released subject to supervision if their removal cannot be timely executed, § 1231(a)(3).  When a noncitizen is released at ICE's discretion, the release is subject to an OSUP "under regulations prescribed by the Attorney General."  8 U.S.C. § 1231(a)(3)(A)–(D).[16]  Those are at 8 C.F.R. § 241.5(a).  The OSUP sets out, *inter alia*, a noncitizen's "reporting requirements, limitations on travel without prior ICE approval, and a mandate that the alien continue efforts to obtain a travel document and assist [ICE] in obtaining a travel document."  *Yusov v. Shaughnessey*, 671 F. Supp. 2d 523, 527 (S.D.N.Y. 2009) (cleaned up), *aff'd sub nom. Yusov v. Shaughnessy*, 396 F. App'x 780 (2d Cir. 2010) (summary order); 8 C.F.R. § 241.5(a).

---

[16] Section 241.4(d)(1) gives certain officials the discretion to "release an alien if the alien demonstrates to the satisfaction of the Attorney General or her designee that his or her release will not pose a danger to the community or to the safety of other persons or to property or a significant risk of flight pending such an alien's removal from the United States."  8 C.F.R § 241.4(d)(1).  The regulation requires "[a] copy of any decision. . . to release or to detain an alien shall be provided to the detained alien."  8 C.F.R. § 241.4(d).

Important here, 8 C.F.R. § 241.4(*l*) sets out the process ICE must follow in revoking a

noncitizen's OSUP.  *See* 8 C.F.R. § 241.4(*l*).  Paragraph (*l*)(1), entitled "Violation of conditions

of release," identifies the procedures to be followed when a noncitizen has violated a condition

of her OSUP:

> [a]ny alien. . . who has been released under an order of supervision or other
> conditions of release who violates the conditions of release may be returned to
> custody . . . .  Upon revocation, the alien will be notified of the reasons for
> revocation of his or her release or parole. *The alien will be afforded an initial
> informal interview promptly after his or her return to [ICE] custody to afford the
> alien an opportunity to respond to the reasons for revocation stated in the
> notification.*

*Id.* § 241.4(*l*)(1) (emphasis added).  These procedures thus entail "notification" and, after it, an

informal interview.  As ICE has conceded, the logical interpretation of "notification" is that it

anticipates a written notice.  Tr. at 44.  That reading is supported by the provision, which refers

to the "reasons . . .*stated* in the notification."  8 C.F.R. § 241.4(*l*)(1) (emphasis added).

The ensuing paragraph, (*l*)(2) identifies by title the officials who have the discretion to

revoke release and the circumstances when such discretion can be exercised.  In pertinent part, it

states that:

> [t]he Executive Associate Commissioner [of INS] shall have authority, in the
> exercise of discretion, to revoke release and return to Service custody an alien
> previously approved for release under the procedures in this section.  A district
> director may also revoke release of an alien when, in the district director's opinion,
> revocation is in the public interest . . .

*Id.* § 241.4(*l*)(2).  The Executive Associate Director of ICE is today the successor to the

Executive Associate Commissioner of INS.[17]  On July 25, 2019, ICE issued an order delegating,

to the assistant field office director, the Executive Associate Director's authority to take certain

---

[17] "Commissioner means the Commissioner of the Immigration and Naturalization Service prior
to March 1, 2003."  8 C.F.R. § 1.2.

26

steps relating to warrants of removal, reinstatement of removal proceedings, and release of noncitizens from detention. GX M (the "Delegation Order"). That order, however, does not reference authority to revoke OSUPs. *Id.* at 2.

> Release "may be" revoked if, "in the opinion of the revoking official":
>
> (i) The purposes of release have been served;
>
> (ii) The alien violates any condition of release;
>
> (iii) It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or
>
> (iv) The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

8 C.F.R. § 241.4(*l*)(2). Paragraph (*l*)(3), in turn, provides for periodic reviews of the status of detained noncitizens whose release is revoked, beginning three months after revocation of their OSUPs. *Id.* § 241.4(*l*)(3).

At the threshold, the parties disagree about the construction of § 241.4(*l*), specifically, as to the procedural safeguards afforded a noncitizen like Funes who is not alleged to have violated her OSUP. ICE argues that the rights to "notice" and an "informal interview," in which a noncitizen can "respond to the reasons for revocation," are held only by noncitizens whose OSUPs are revoked based on asserted violations of a condition of their OSUP. ICE's argument is textual. It notes that the provision in which these procedural protections are described, § 241.4(*l*)(1), solely discusses revocations based on violations of "the conditions of release." *Id.* § 241.4(*l*)(1). ICE argues that noncitizens who are released for other reasons, to wit, those listed in § 241.4(*l*)(2)—including as relevant to Funes, where ICE determines that "[i]t is appropriate to . . . commence removal proceedings," *id.* § 241.4(*l*)(2)(iii)—are not entitled either to notice or an informal interview. Funes counters that the regulation is properly read to afford these procedural

27

protections whether the revocation is based on a claimed violation or for other discretionary reasons. And, she notes, her reading has been heeded in practice by ICE itself.

Funes' argument is, on balance, more persuasive.

In interpreting an agency regulation, a court must "carefully consider the text, structure, history, and purpose of [the] regulation, in all the ways it would if it had no agency to fall back on." *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (cleaned up); *Green v. Brennan*, 578 U.S. 547, 553–54 (2016); *Garcia v. Garland*, 64 F.4th 62, 73 (2d Cir. 2023); *Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 232 (2d Cir. 2020). The Court thus begins its analysis with § 241.4(*l*)'s text.

ICE contends that § 241.4(*l*) textually admits only its reading, because the regulation references notice and interview only in provision (*l*)(1). That argument has a degree of force, in that (*l*)(1) discusses revocations based on violations of an OSUP's conditions and does not reference revocations on other grounds. But a closer review belies the premise of this argument: that, textually, provisions (*l*)(1) and (*l*)(2) are mutually exclusive, with the former uniquely applicable only to alleged violators of OSUPs and the latter uniquely applicable to all others.

For one, the two provisions are not titled so as to suggest that they are addressed to mutually exclusive populations. Such might have been the case had they been, respectively, entitled "Revocation based on violations of conditions of release" and "Revocation for other reasons." Instead, the two provisions bear asymmetric titles: "Violations of conditions of release" (*l*)(1), and "Determination by the Service," (*l*)(2). And, as to their content, the provisions nowhere say that procedural protections defined in (*l*)(1) apply only to persons alleged to have violated conditions of release. Instead, fairly read, the two provisions, rather than delineating separate populations, address different topics within the broader ambit of section

(*l*), which is entitled "Revocation of release." The first subsection sets out procedural protections in connection with revocation. The second enumerates the bases on which ICE may exercise its discretion to revoke an OSUP.

That the two provisions are not mutually exclusive—*i.e.*, that they do not deal with separate groups of noncitizens released on OSUPs—is powerfully supported by the fact that paragraph (*l*)(2) lists, as one "discretionary" basis on which ICE may revoke an OSUP, "violat[ing] any condition of release." 8 C.F.R. § 241.4(*l*)(2)(ii). "This overlap," as Judge Rochon has rightly recognized, "belies [ICE's] argument that these are two separate processes, and suggests that paragraph (*l*) sets forth a unified set of procedures for the revocation." *Zhu v. Genalo*, No. 25 Civ. 6523, 2025 WL 2452352, at *6 (S.D.N.Y. Aug. 26, 2025); *see also Ceesay v. Kurzdofer*, 781 F. Supp. 3d 137, 163–64 (W.D.N.Y. May 2, 2025).[18]

And there is another revealing overlap. The ensuing provision, (*l*)(3), identifies the custodial review process required to take place after three months if a noncitizen is "not released from custody following the informal interview provided for in paragraph (*l*)(1)." But despite the fact that this subsection cites (*l*)(1) and not (*l*)(2), the review process in (*l*)(3) has been held applicable to *all* noncitizens detained subject to § 241.4, not merely those detained based on a violation of a condition of their release. *See, e.g.*, *Callender v. Shanahan*, 281 F. Supp. 3d 428, 432–35 (S.D.N.Y. 2017) (recognizing a general right to a custody review under § 241.4); *Portillo v. Decker*, No. 21 Civ. 9506 (PAE), 2022 WL 826941, at *4 (S.D.N.Y. Mar. 18, 2022) (describing custody review framework that ordinarily flows from § 241.4); *see also You, Xiu Qing*, 321 F. Supp. 3d 451, 463–64 (S.D.N.Y. 2018) (same even when individual was not

---

[18] Respondents acknowledge that the cases addressing this issue have all held that the procedural protections of notice and an interview attach outside the violation context. Tr. at 45.

detained pursuant to § 241.4). That the review process required by ($l$)(3) is triggered by the interview mandated in ($l$)(1) supports Funes' argument that the procedural protections in ($l$)(1)—notice and an informal interview "promptly after his or her return to [ICE] custody"—extend to all noncitizens whose OSUPs have been revoked.

Funes' textual arguments, in combination, have considerable force. The Court's assessment is that, although § 241.4($l$) is far from pellucid prose, Funes' construction—under which the procedural protections of notice and an interview extend to persons whose release is revoked on any of the grounds listed in the subsection ($l$)(2)—is, on balance, more persuasive.

The Court is not alone in holding that the text of § 241.4($l$) sets forth a unified set of procedures governing the revocation of release. Every other court in this Circuit to resolve the issue has similarly held. *See, e.g.*, *Zhu*, 2025 WL 2452352, at \*6–7 (collecting cases); *M.Q. v. United States*, 2025 WL 965810, at \*3, 5 n.1 (S.D.N.Y. Mar. 31, 2025) (holding that the framework governing discretionary revocation of an OSUP requires notice and an initial informal interview); *You, Xiu Qing*, 321 F. Supp. 3d at 463 (holding that "[e]ven assuming *arguendo* that respondents had the authority to revoke Petitioner's release under § 241.4 in May 2018, they could not detain him without providing him with notice and an informal interview."); *see also Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1019 (Sotomayor, J., statement respecting disposition of the application) (noting, without qualification, that under "8 C.F.R. § 241.4($l$) . . . in order to revoke conditional release, the Government must provide adequate notice and 'promptly' arrange an 'initial informal interview. . . to afford the alien an opportunity to respond to the reasons for the revocation stated in the notification.'" (quoting 8 C.F.R. § 241.4($l$))). ICE has not appealed these decisions or identified contrary authority. *See Zhu*, 2025 WL 2452352, at \*6 (observing respondents have "not cited to a single case in support of its interpretation of 8

C.F.R. § 241.4(*l*), either in its papers or during the habeas hearing, and courts have consistently held otherwise.").[19]

Also tellingly, ICE has long administratively taken the same position as Funes does here. The form Notice of Revocation of Release that ICE furnishes noncitizens upon revocation— including Funes here—expressly states: "You will promptly be afforded an informal interview at which you will be given an opportunity to respond to the reasons for the revocation." Notice at 1. This language tracks that of subsection (*l*)(1). The Notice further states that it was issued pursuant to "8 C.F.R. 241.4," without specifying any subsection.[20] *Id.* ICE's use of language to this effect in such notices appears to date back at least eight years.[21]

------

[19] The Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 678 (2001), although not specifically implicating § 241.4(*l*), lends indirect support to this interpretation insofar it underscored the important procedural protections that § 241.4 gives noncitizens subject to removal. The Court there held, as a matter of statutory construction, that an alien may not be indefinitely held in custody after a final order of removal has been entered. The majority noted the important procedural safeguards supplied by § 241.4. *Id.* at 683–84. Justice Kennedy's dissent likewise noted the robust procedural protections that that provision affords noncitizens with respect to detention during the removal process. He noted that § 241.4 had been "promulgated after notice and comment," aims to "give[] structure to the discretion delegated by the INA in order to ensure fairness and regularity in [ICE] detention decisions," and provides for an "initial post-custody review" prior to the expiration of the statutory removal period and for periodic reviews thereafter of the noncitizen's detention status. *Id.* at 722 (Kennedy, J., dissenting).

[20] Haynes' conduct—including the Notice he prepared that evening for Funes that promised a "prompt . . . informal interview" — indicates that he understood that Funes was entitled to be provided with notice and an informal interview. *See* Tr. 229, 261.

[21] A reported case describes that ICE, on August 1, 2017, furnished a "Notice of Revocation of Release" to a noncitizen whose OSUP had been revoked based on the discretionary determination "there [was] a significant likelihood of removal." *Rombot v. Souza*, 296 F. Supp. 3d 383, 385 (D. Mass. 2017) (quoting Dkt. 1–9 at 1). The language of that notice—which is publicly filed on the docket of that case—substantially tracks that of the Notice given to Funes, including in stating that the noncitizen will "promptly be afforded an informal interview at which [she] will be given the opportunity to respond to the reasons for the revocation." *Rombot v. Souza*, 17 Civ. 11577 (D. Mass. Aug. 22, 2017), Dkt. 1–9 at 1.

The history of the regulation as implemented by ICE thus belies the agency's recent litigation position—apparently adopted in opposing habeas challenges to revocations in which ICE was claimed to have failed to provide the procedural safeguards of § 241.4(*l*)—that these protections apply only where the revocation is based on violating a condition of release. *See Zhu*, 2025 WL 2452352 at *8 (finding ICE's provision of such notices suggested that it understands the regulation to require same); *Ceesay*, 781 F. Supp. 3d at 163 (citations omitted). And where an agency's prior practice reflects the understanding of officials capable of dictating authoritative policy—as is suggested by the longstanding nature of the practice here—such may provide interpretative assistance. *See Kisor*, 588 U.S. at 577; *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 614 (2013); *cf. Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 167 (2012) (declining to accept agency's formalistic interpretation when contradicted by agency's past practice). Courts are not to "defer to an interpretation that represents a convenient litigating position or a *post hoc* rationalization advanced by an agency seeking to defend past agency action against attack." *Garcia*, 64 F.4th at 74 (cleaned up); *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (rejecting deference to "agency litigating positions" where unsupported by agency practice); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action . . . ."); *accord Ceesay*, 781 F. Supp. 3d at 163 (finding that the "government's stance that no informal interview is required in Ceesay's situation is a *post hoc* rationalization of past agency action that should not be given deference" (cleaned up)).

The Court thus holds that, under § 241.4(*l*), Funes was entitled to "notice of the reasons for the revocation of her release" and "an informal interview promptly after . . . her return to

custody [that] afford[e]d [her] an opportunity to respond to the reasons for revocation stated in the notification."

### 2. Application

The parties disagree as to ICE's compliance with both the notice and informal interview requirements of § 241.4(*l*).

#### a. *Notice*

ICE contends that it satisfied § 241.4(*l*)'s notice requirement based on an oral statement made to Funes at her July 14 check-in and on Haynes' oral statements during her September 8 check-in. Alternatively, ICE relies on the written Notice Haynes gave her in her cell, hours after she had been taken into custody.[22] Funes counters that none of these satisfied § 241.4(*l*).

##### i. July 14 Check-In

ICE argues that because Funes had been told on July 14, 2025 to come back "with plans to depart," she was on notice that she would be deported at her next check-in. Tr. at 317. For multiple reasons, that statement did not supply the notice required by § 241.4(*l*).

It was not in writing, as all parties agree was required of a notification. It was not made "[u]pon revocation," 8 C.F.R. § 241.4(*l*), but nearly two months earlier. It did not set out the reason(s) for Funes' revocation, thus preventing Funes from responding to those reasons. Nor could the July 14 "notification" have provided the reason, because the acquisition of Funes' passport—which Haynes testified was the reason for the revocation on September 8—had not yet occurred. Santoro supplied that to ICE on July 14, when she filed Funes' stay application *after*

---

[22] At the hearing, ICE argued that the OSUP itself might supply the requisite notice. *See* Tr. at 198–99. That is wrong, because the "notice" required by § 241.4(*l*) must set out "the reasons for revocation." *See* 8 C.F.R. § 241.4(*l*). Funes' OSUP did not set out the reasons for revocation— it set out the conditions for Funes' release.

33

the July 14 check-in.  And Haynes testified that he first observed the travel document in Funes'
file on September 8.

### ii.    September 8 Check-In

ICE next relies on Haynes' oral statements during the September 8 check-in.  Those also
do not satisfy § 241.4(*l*), again, for multiple reasons.

Haynes' statements to Funes and Santoro were not in writing.  His statements during the
check-in as to the agency's reasons for taking Funes into custody also were not accurate.  Haynes
testified that the reason he recommended (and supervisor Finnie approved) revoking Funes'
OSUP was that ICE now had a travel document to enable her removal.  But the Court has found
that Haynes likely did not say that to Funes and Santoro.  Instead, as Haynes at one point
described his statement to Funes, he "just explained to her that she's going to be detained and
taken into custody," *id.* at 252; *see also id.* (conceding that the words Haynes used during check-
in did not "exactly" track the later Notice).  That terse statement was reason-free.  It does not
qualify as a "notifi[cation] of the reasons for revocation," which must be supplied "[u]pon
revocation."  8 C.F.R. § 241.4(*l*)(1).

To be sure, the Court has found that, when asked why Funes was being taken into
custody, Haynes replied that there was a "new [P]resident" and "anybody" with a final order or
removal would be detained.  But Haynes, ICE's only witness, denied that those were, in fact, the
agency's reasons for revocation.  Respondents' counsel, at the hearing, denied the same.  ICE
cannot rely on these reasons in contending that Haynes' statements at the check-in supplied the
requisite notification.

### iii.    Written Notice on the Evening of September 8

ICE finally relies on the written Notice given to Funes in her 10th floor cell on
September 8 sometime after 7:50 p.m., the time at which it was digitally signed by acting field

office director Folajaiye. *See* Tr. at 23, 249. Unlike the oral statements at the July 14 and

September 8 check-ins, the Notice set out ICE's reason for revoking Funes' OSUP: that "ICE has

determined that you can be expeditiously removed from the United States pursuant to the

outstanding order of removal against you." Notice at 1. For other reasons, however, the Notice

does not satisfy § 241.4(*l*).

First, the Notice was not provided to Funes "[u]pon revocation." Funes was notified of

the revocation at the start of her check-in, which Santoro credibly testified was at approximately

8:30 a.m. From that point forward, she was not free to leave. And by at least 1:03 p.m., Funes

had been placed in a cell on the 10th floor. Measured from either point, she did not receive the

notification until many hours after revocation. By the time Funes received the Notice, it was

nighttime and, her counsel had long since left 26 Federal Plaza. Funes was confined in a cell

without her cell phone and on track to be transferred out-of-state the next morning.

Second, the Notice is factually inaccurate on fundamental points. It stated that Funes was

subject to an administratively "final order of removal" dated "November 4, 2024." *See id.* In

fact, Funes' final order of removal was dated 20 years earlier, on November 4, 2004. *See* Tr. at

253 (conceding this inaccuracy). It recited the statutory basis for Funes' detention as "8 C.F.R

241.4 / 8 C.F.R 241.13." Notice at 1. In fact, although the former provision applied to Funes,

the latter, from ICE's perspective, assuredly did not. Section 241.13 applies to noncitizens who

have been detained and have proffered "good reason to believe there is no significant likelihood

of removal" to their home country, such as where ICE has been unable to procure a travel

document or visa. 8 C.F.R. § 241.13; *see, e.g.*, *Zhu*, 2025 WL 2452352, at *8 n.3. Crediting

Haynes' testimony, ICE, in deciding to revoke the OSUP, believed the opposite: it now had a

travel document sufficient to enable Funes' removal. Entirely apart from Funes' practical

inability—in her cell, at night, without access to counsel, and with transport out-of-state

looming—to respond to the Notice, these errors could have complicated, if not compromised, her

response.

Third, respondents have not established that the Notice revoking Funes' OSUP was

signed by an official with authority to do so. At the hearing, Haynes identified the signatory of

the Notice as acting assistant field office director Folajaiye. Tr. at 247, 277.[23] Haynes testified

that he understood that Folajaiye, who is senior to Finnie, was the final decisionmaker as to the

revocation decision. *Id.* at 277–78. Respondents argue that, under the Delegation Order,

Folajaiye was authorized to revoke Funes' OSUP.

The Delegation Order, issued July 25, 2019, delegates authority over certain actions from

Nathalie R. Asher, ICE's Executive Associate Director, to "assistant field office directors."

Delegation Order at 2. It gives assistant field office directors "[a]uthority under INA § 241

[8 U.S.C. § 1231] and 8 C.F.R. Part 241, relating to *warrants of removal, reinstatement of*

*removal, self-removal, and release of aliens from detention.*" *Id.* (emphasis added). Absent

from this list of delegated authority, however, is revocation of OSUPs.

The absence of such a reference is decisive. Respondents' argument that the Delegation

Order gave Folajaiye authority to revoke OSUPs is based exclusively on the text of that order.

Respondents have not come forward with any of the supporting evidence that one might have

expected to exist had ICE in fact intended to delegate such authority to assistant field officer

directors—for example, pre-issuance memoranda from agency officials addressing the scope of

the order before it issued, written communications among such officials, or declarations from

---

[23] The Notice terms Folajaiye an acting field office director. Notice at 1. Haynes testified that was an apparent "a typo," as it omits the word "assistant" from Folajaiye's title. Tr. at 247–48.

percipient witnesses. And standard tools of textual construction defeat respondents' claim that the Delegation Order gave Folajaiye the required authority.

Under the interpretive canon *expressio unius*, the omission of one item from a list of like items implicitly excludes that item. *See, e.g.*, *Bittner v. United States*, 598 U.S. 85, 93–95 (2023); *Gallardo By & Through Vassallo v. Marstiller*, 596 U.S. 420, 431–33 (2022); *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015); *Brennan-Centrella v. Ritz-Craft Corp.*, 942 F.3d 106, 111 (2d Cir. 2019). Here, because the Delegation Order lists a series of other actions under 8 C.F.R. § 241 as to which authority has been delegated but does not include OSUPs or their revocation, the *expressio unius* canon excludes revocation. As Judge Garnett recently held, while analyzing the same Delegation Order, that omission is "[f]atal" to ICE's delegation argument, because "[r]evocation of release, which is a specific event enumerated elsewhere in the governing regulations, is found nowhere in the list of authorities delegated to assistant field office directors in the Delegation Order." *E.M.M. v. Almodovar*, No. 25 Civ. 8212, 2025 WL 3077995, at *6 (S.D.N.Y. Nov. 4, 2025); *accord Ceesay*, 781 F. Supp. 3d at 162 (finding that "there is no delegation order clearly giving [an assistant field office director] the authority to revoke release").[24]

Respondents' two counterarguments fail.

First, respondents argue that the term "related to" in the Delegation Order should be read expansively, to pick up non-enumerated agency actions notwithstanding their omission from the order. They rely on the construction of that term in *Coregis Insurance Company v. American*

---

[24] The powers delegated under "8 C.F.R. 241" track, literally or substantially, the headers of certain subsections in § 241: "warrants of removal" (§ 241.2), "reinstatement of removal" (§ 241.8), "self-removal" (§ 241.7), and "release of aliens from detention" (§ 241.4(e)–(f)). No language in the Delegation Order, however, tracks the header to § 241.4(*l*), "[r]evocation of release."

*Health Foundation*, 241 F.3d 123, 128–29 (2d Cir. 2001). But *Coregis* is far afield. It construed

the term "related to" in assessing an "insolvency exclusion" in an insurance policy, interpreting

"the "ordinary meaning of the term 'related to' as used in th[at] provision." *Id.* at 128. The

Circuit nowhere conveyed that this tool applied outside that niche. And the policy text in

*Coregis* did not implicate the *expressio unius* canon. Moreover, respondents cherry-pick in

citing *Coregis*. Other Second Circuit decisions, including ones post-dating *Coregis*, have

adopted narrower constructions of "related to." *See, e.g.*, *Bano v. Union Carbide Corp.*, 273

F.3d 120, 128 (2d Cir. 2001) (narrowly interpreting "related to" in light of a Supreme Court of

India decision regarding whether claims reasonably were related to a disaster); *Davis v. J.P.

Morgan Chase & Co.*, 587 F.3d 529, 531–33 (2d Cir. 2009) (interpreting the use of "related to"

in a regulation circumscribing work related to management policies); *In re Lafayette Radio

Elecs. Corp.*, 761 F.2d 84, 89 (2d Cir. 1985) (evaluating "related to" in the context of a

bankruptcy court's exercise of jurisdiction); *My Play City, Inc. v. Conduit Ltd.*, 589 F. App'x

559, 562 (2d Cir. 2014) (summary order) (analyzing "related to" in construing limitation on

liability for certain claims).

Second, respondents argue that if the Court finds the Delegation Order ambiguous, it

should defer to Haynes' interpretation of it, pursuant to *Kisor*. But the Court has not found the

Delegation Order "genuinely ambiguous" on the point at issue. There is thus no occasion to

consider the agency's interpretation—if Haynes' take on it could even constitute an "official"

interpretation. *Kisor*, 588 U.S. at 577.[25]

---

[25] In any event, Haynes' testimony on this point was ambiguous. He stated that OSUPs are
revoked by "[t]he assistant field office director *and above.*" This conjunctive formulation does
not make clear whether, in his view, authorization in addition to ("above") that of an assistant
field office director was required. Tr. at 161 (emphasis added).

Respondents have thus not carried their burden to show that the Delegation Order authorized Folajaiye, an acting assistant field office director, to revoke Funes' OSUP. Other ICE officials assuredly had that authority, but respondents have not adduced evidence that any person with such authority did so. Because Folajaiye's approval of the revocation was *ultra vires*, the revocation of Funes' OSUP was void as unauthorized.

> b.    *Informal Interview*

ICE also did not comply with § 241.4(*l*)'s interview requirement: that the noncitizen, "promptly after . . . return to custody," be given an "informal interview" to afford an opportunity to respond to the reasons for revocation stated in the notice. Even if the Notice given to Funes the night of September 8 satisfied the regulation's notice requirement, it is undisputed that Funes thereafter never had an interview of any kind. Instead, the next morning, she was transferred to Louisiana.

In claiming compliance with the interview requirement, respondents are compelled to rely instead on the exchange among Funes, Santoro, and Haynes at the September 8 check-in. They note that after Haynes told Funes she would be detained, she made statements in "response." As later memorialized by Haynes on a form titled "Alien Informal Interview," her statements were: "I would like to leave my kids with my husband and have a reasonable fear interview. I understand that I will be detained and receive the interview, and my husband will pick my US citizen child up." GX L.

For two reasons, Funes' exchange with Haynes did not satisfy § 241.4(*l*), notwithstanding Haynes' later memo having labeled it an "informal interview."

Most importantly, the exchange was not preceded by notice to Funes stating the reasons for revoking her OSUP. Haynes' only statements during the check-in accounting for her detention were that there was a "new [P]resident" and all persons with a final order of removal

were being detained. ICE has disclaimed those as its reasons for the revocation. And, as explained above, those oral statements could not qualify as the notice required as the predicate to an informal interview. Unsurprisingly, therefore, Funes' statements as memorialized did not engage with ICE's reasons for the revocation, which it supplied only later. They instead addressed logistical concerns: the care of her minor children and the fate of her pending reasonable fear interview.

Separately, Haynes' testimony refuted that, as of the check-in, Funes was "in custody"— also a pre-condition of the informal interview required by § 241.4(*l*). Haynes testified that, during the "entire time an alien is on the fifth floor," she is "considered not to be in detention." Tr. at 159. And, he stated, consistent with his general practice, he advised Funes that she was "*going* to be taken into custody." *Id.* at 189 (emphasis added). He also testified that, after the check-in and "[b]efore she was taken into custody," he completed the forms regarding the care of her children. *Id.* at 232. As respondents put the point at the hearing: "[Funes'] interview. . . was administered by Officer Haynes on the 5th floor *before* she was taken into custody on the 10th floor." *Id.* at 42 (emphasis added). To be sure, as the Court has found, in practical reality, once Haynes told Funes that she would be detained, she realistically was not free to leave 26 Federal Plaza. But, on respondents' account, she was not in custody at the time she spoke with Haynes. Her exchange with Haynes, thus, could not have satisfied § 241.4(*l*).

**B.    Did ICE Infringe Funes' Due Process Rights?**

The Court next considers whether ICE, in failing to provide Funes with the required notice of the reasons for revocation and a prompt informal interview at which to respond, violated her right to due process.

40

The Fifth Amendment provides that "[n]o person shall be . . . be deprived of life, liberty, or property, without due process of law."  U.S. Cont. amend. V.  It is black-letter law that noncitizens have due process rights—these follow whether a person's presence in the United States is "lawful, unlawful, temporary, or permanent."  *Zadvydas*, 533 U.S. at 693; *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("There are literally millions of aliens within the jurisdiction of the United States.  The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law."); *see also Wong Wing v. United States*, 163 U.S. 228, 238 (1896) ("[E]ven aliens shall not be . . . deprived of life, liberty, or property without due process of law."); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 597–99 (1953) (same).  As the Supreme Court has held, noncitizens such as Funes who are subject to final orders of removal have procedural due process rights.  *See Zadvydas*, 533 U.S. at 693–94.

At the threshold, respondents argue that Funes cannot claim a due process violation.  They argue that, in light of ICE's broad enforcement discretion over OSUPs, she lacked a protectable liberty interest.

Respondents are wrong.  Funes does not claim a right to be free from ICE custody.  She claims a right not to be detained without adequate process.  And the Second Circuit has held that the existence of executive discretion does not preclude a procedural due process challenge.  *Velasco Lopez v. Decker*, 978 F.3d 842, 849–50 (2d Cir. 2020).  Consistent with this, courts in this Circuit have widely rejected the same or similar arguments by the Government in recent months.  They have recognized that even when a noncitizen's re-detention is statutorily committed to ICE's discretion, the Due Process Clause gives the noncitizen procedural rights in connection with the decision to deprive them of liberty.  *See, e.g.*, *Lopez Benitez v. Francis*, 2025

41

WL 2371588, at *9 (S.D.N.Y. Aug. 13, 2025); *Chipantiza-Sisalema v. Francis*, 2025 WL

1927931, at *3 (S.D.N.Y. July 13, 2025).  That is so even where a noncitizen is subject to a final

removal order and at liberty on an OSUP.  *See E.M.M.*, 2025 WL 3077995, at *3–4; *Ceesay*, 781

F. Supp. 3d at 154.

      In *Lopez Benitez*, for example, Judge Ho held that a Paraguayan national, released on his

own recognizance and re-detained after a scheduled immigration appearance at 26 Federal Plaza,

at that point still possessed a "most significant liberty interest"—"the interest in being free from

imprisonment," which could not be abridged without "adequate procedural protections."  2025

WL 2371588, at *9 (citation omitted).  In *Chipantiza-Sisalema*, Judge Torres held that,

notwithstanding ICE's discretion over whether to detain an Ecuadorian national in order to

enable her removal from the United States, "the agency must comply with the procedures already

in place, and its failure to do so amounts to a complete and arbitrary denial of due process."

2025 WL 1927931, at *3.  In *Samb*, Judge Ho held that a Senegalese citizen who had illegally

entered the United States and who could be detained at ICE's discretion could still vindicate "his

rights under the Due Process Clause."  *Samb v. Joyce*, 2025 WL 2398831, at *1–3 (S.D.N.Y.

Aug. 19, 2025).

      Finally, in the two most factually apposite cases—each involving the detention at an ICE

check-in of a noncitizen subject to an OSUP—the courts rejected the same argument ICE

advances here.  In *Zhu*, Judge Rochon held that a "[p]etitioner's liberty interests are implicated

by [her] redetention even if ICE has discretion to revoke [her] supervision."  2025 WL 2452352,

at *4.  And in *Ceesay*, Judge Vilardo recognized that "the mere fact that the government has the

authority to detain someone does not mean that it may do so in any manner it chooses, without

affording due process."  781 F. Supp. 3d at 157 ("Procedure is not mere puffery, a gesture that is

irrelevant so long as the result is correct.  The Constitution safeguards not just substantive rights

under the law but due process as well.").  ICE's discretion to detain Funes thus does not preclude

her due process challenge.[26]

As to the merits of Funes' due process claim, the Supreme Court has long recognized

that, where "the rights of individuals are affected, it is incumbent upon agencies to follow their

own procedures."  *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *accord Singh v. U.S. Dep't of Just.*,

461 F.3d 290, 296 (2d Cir. 2006) (an "administrative agency must adhere to its own

regulations").  Of course, when the minimal elements of due process—notice and an opportunity

to be heard—have been satisfied, a failure by an agency to adhere to its own regulations does

---

[26] Respondents cite a series of cases they claim establish that a noncitizen does not have an entitlement to, and thus lacks a protected liberty interest in, discretionary relief. Dkt. 18 at 17–19. Judge Rochon convincingly distinguished these cases in *Zhu*. None, she noted, challenged a detention decision based on inadequate process. Each concerned "inapposite circumstances" in which the petitioner claimed "a right to relief that is otherwise discretionary, such as cancellation of removal." *Zhu,* 2025 WL 2452352, at *5; *Zhu,* 25 Civ. 6523, (S.D.N.Y. Aug. 15, 2025), Dkt. 10 at 11–12.

Specifically: *Yuen Jin v. Mukasey*, 538 F.3d 143, 156-57 (2d Cir. 2008) involved a noncitizen who had been already ordered deported and, therefore, could not assert a liberty interest in the reconsideration of a discretionary grant of asylum. *Matias v. Sessions*, 871 F.3d 65, 72 (1st Cir. 2017), involved a noncitizen who was seeking discretionary relief from the Board of Immigration Appeals ("BIA") and was found to lack a cognizable liberty interest in that relief and, in turn, could not bring a due process claim. *Rojas-Reyes v. INS*, 235 F.3d 115, 124–25 (2d Cir. 2000), denied a procedural due process challenge to the BIA's denial of a noncitizen's motion to reopen deportation proceedings, finding she had already received a "full and fair review" and any further relief was discretionary. *Smith v. Ashcroft*, 295 F.3d 425, 430 (4th Cir. 2002) distinguished between "the discretionary right to suspension of deportation" and "a liberty or property interest protected by the Due Process Clause." *Appiah v. U.S. INS*, 202 F.3d 704, 709 (4th Cir. 2000) entailed a noncitizen's petition for suspension of his deportation order. *Ashki v. INS*, 233 F.3d 913, 920–21 (6th Cir. 2000), relying on *Appiah*, denied an appeal of a final BIA order. *Assaad v. Ashcroft*, 378 F.3d 471, 475–78 (5th Cir. 2004), challenged a BIA decision denying a noncitizen's motion to reopen removal proceedings due to ineffective assistance of a prior immigration counsel. And *Oguejiofor v. Att'y Gen. of U.S.*, 277 F.3d 1305, 1309–10 (11th Cir. 2002) (per curiam), rejected a retroactivity challenge to a discretionary removal decision.

not, of itself, violate due process. *See McDarby v. Dinkins*, 907 F.2d 1334, 1337–38 (2d Cir. 1990). But "[t]he notion of fair play animating [the Fifth] [A]mendment precludes an agency from promulgating a regulation affecting individual liberty or interest, which the rule-maker may then with impunity ignore or disregard as it sees fit." *Montilla v. I.N.S.*, 926 F.2d 162, 164, 167 (2d Cir. 1991).

Here, ICE's failure to follow the important procedural requirements of § 241.4(*l*) violated the Due Process Clause. That provision was designed to give noncitizens the minimal elements of due process—notice and an opportunity to be heard—and to do so close in time to the infringement of their liberty interest. Funes was denied those procedural protections. She did not receive notice of the reasons for revoking her OSUP until many hours after she had been detained, by which time she had been separated from her family and counsel, housed in a cell, and put on track for transfer out-of-state the next morning. And, far from being given an informal interview "promptly [there]after" and "an opportunity to respond to the reasons" for revocation, she was never given an interview. ICE's denial of those basic procedural protections in the course of detaining her denied her due process. *See, e.g., Zhu*, 2025 WL 2452352, at *9 ("ICE's failure to follow its own regulations and provide Petitioner with notice or an interview violated Petitioner's procedural due process rights"); *Ceesay*, 781 F. Supp. 3d at 164 ("ICE was required to afford Ceesay at least an informal interview . . . ICE's failure to afford Ceesay such an interview violated his right to due process."); *cf. E.M.M.*, 2025 WL 3077995, at *4 (granting habeas petition on ground that an assistant field office director of ICE is not authorized under § 241.4 to revoke release).

This case, in fact, supplies an excellent illustration of the important purposes served by the procedural protections—notice and an opportunity to be heard—that Funes was denied. As

her immigration counsel explained, Funes had substantial arguments available as to why ICE should exercise its discretion to refrain from detaining her and removing her to Honduras. Her husband had, just earlier this year, been granted asylum by an immigration judge based on a well-founded fear of persecution in Honduras. Her noncitizen daughter, age five, was also granted asylum. Her son, age two, is a U.S. citizen. The three other members of Funes' immediate family thus each have the right to remain in the United States. In addition, as of September 8: (1) Funes had pending with ICE a derivative asylum application, based on the grants of asylum to her husband and daughter; (2) Funes' reasonable fear interview with immigration authorities had yet to be scheduled; and (3) Funes had an appeal pending in the Second Circuit challenging her final removal order.[27] Funes had also filed the stay application, and although Haynes notified Funes at the September 8 check-in that it been denied, the circumstances left unclear whether ICE had considered the supplemental materials Santoro had furnished on July 21. In appealing to ICE's discretion, Santoro would also have had available arguments to the effect that Funes is a law-abiding and productive member of her community, and that her unlawful entry to the United States at age 10 in the company of her mother should not be held against her.[28]

The events of September 8, however, as a practical matter disabled Funes from meaningfully presenting these arguments. Funes was informed at the outset of the check-in that

---

[27] To the extent that Santoro or Funes made any of these points during the September 8 check-in, they did so with Haynes only. Haynes, as he acknowledged, did not have authority to make a final determination as to the OSUP. Nor did his supervisor, Finnie. And there is no evidence that Haynes reported any of these points to an ICE official with such authority.

[28] Affidavits submitted by Funes in this litigation attest that she does not have a criminal record; that she worked as a teacher in Honduras; that she looks after her minor nieces while their parents work; and that she is a member of her church in Islip, New York. Dkt. 26-2 at 2; Dkt. 26-3 at 2.

she would be detained that day. That decision had been made by, presumably, a supervisor or supervisors of Haynes, who, in turn, conveyed that outcome to Funes at the start of the check-in. As for the reasons for the decision, at first these were not conveyed to Funes at all; when she and Santoro asked, they were given reasons that ICE now repudiates as false: that there is a "new [P]resident" and that anybody with a removal order was being taken into custody. In this context, Funes and Santoro's limited bids for mercy or a one-week adjournment from Haynes were bound to fail. Their dialogue with him instead focused on practical consequences such as arranging for Funes' son to be picked up before she was detained. It was not until nighttime that Funes received a written notification of ICE's reason for the detention: that, with its having obtained a Honduran travel document, ICE anticipated her imminent removal. But by that time, Funes had long been separated from her lawyer and her husband; she was in a holding cell without her cell phone; and there was no opportunity for her to respond to an official within ICE, let alone to an official with authority to reassess the revocation decision, let alone before she was transported the next morning to Louisiana.

The Court cannot find that, with proper notice and a prompt informal interview at which to respond to ICE's reason for revocation, Funes and her counsel's appeals surely would have caused ICE to reverse its exercise of discretion. But nor can the Court find the opposite: that such appeals would inevitably have been futile. ICE's denial to Funes of the fundamentals of due process leave it unknown and unknowable whether, had the agency abided by § 241.4(*l*), Funes' liberty would have been curtailed.

## C.    Remedy

### 1.    Release from Custody

Funes argues that the proper remedy for ICE's due process violation is her release from custody. ICE counters that the Court, without releasing Funes, should order ICE now to give her

the process she was denied: a compliant written notice setting out the reasons for revocation that was approved by an official with revoking authority, promptly followed by an informal interview at which Funes would have an opportunity to respond.

Funes' argument is more persuasive.

On finding a constitutional violation such as here, a district court "may" grant a writ of habeas corpus and "dispose of the matter as law and justice require." 28 U.S.C. §§ 2241(a), 2243. The court has "equitable discretion to decide whether to issue the writ or to provide a remedy." *Edwards v. Vannoy*, 593 U.S. 255, 289 (2021) (Gorsuch, J., concurring). "That acknowledgement of discretion is merely the continuation of a long historic tradition." *Withrow v. Williams*, 507 U.S. 680, 716 (Scalia, J., concurring in part).

The common-law history of the writ underscores that the traditional remedy in habeas is release from illegal custody. *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973); *accord Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107 (2020) ("Habeas has traditionally been a means to secure *release* from unlawful detention." (emphasis in original)); *Munaf v. Geren*, 553 U.S. 674, 693–94 (2008).[29] Where a party seeks relief beyond "simple release," the Supreme Court has held such claims to be "so far outside the 'core' of habeas" that they "may not be pursued through habeas." *Thuraissigiam*, 591 U.S. at 119. In *Munaf*, for example, the Supreme Court found the relief sought by the habeas petitioners not appropriate as a remedy in habeas. Those petitioners, although styling their request as seeking "release," in fact sought to preclude

---

[29] In 1768, Blackstone's Commentaries described habeas as a means to "remov[e] the injury of unjust and illegal confinement." *Thuraissigiam*, 591 U.S. at 117 (quoting 3 W. BLACKSTONE, COMMENTARIES 137). The habeas remedy served to ensure that no individual "can be long detained imprison, except in those cases in which the law requires and justifies such detainer." 3 W. BLACKSTONE, COMMENTARIES 131. In 1833, Justice Story similarly described the common law writ. *See Thuraissigiam,* 591 U.S. at 117.

their transfer to another sovereign's custody. 553 U.S. at 692–94. Similarly, in *Thuraissigiam*, the Supreme Court rejected, as an improper habeas remedy, vacating a removal order and granting a new opportunity to seek asylum. *Thuraissigiam*, 591 U.S. at 117–18.

Respondents have not identified persuasive authority that the remedy in habeas for a procedural due process violation resulting in a loss of liberty is an order mandating corrective "process." Respondents cite two long-ago cases: *U.S. ex rel. Bilokumsky v. Tod*, 263 U.S. 149 (1923) and *U.S. ex rel. Ling Yee Suey v. Spar*, 149 F.2d 881 (2d Cir. 1945). But each predates the modern federal habeas statute, adopted in 1948. *See* Act of June 25, 1948, ch. 646, 62 Stat. 869 (revising and codifying Title 28 of the U.S Code).[30] And the excerpt, below, from *Bilokumsky* on which respondents rely does not, on close analysis, avail them:

> A writ of habeas corpus is not like an action to recover damages for an unlawful arrest or commitment, but its object is to ascertain whether the prisoner can lawfully be detained in custody; and if sufficient ground for his detention by the government is shown, he is not to be discharged for defects in the original arrest or commitment.

*Bilokumsky*, 263 U.S. at 158. *Bilokumsky* drew this quote from an 1892 case, *Nishimura Ekiu v. United States*, 142 U.S. 651, 662 (1892), which applied a finality provision of the Immigration Act of 1891. The statutes at issue in that case, as the Supreme Court has noted, do not resemble modern immigration law. *See Thuraissigiam*, 591 U.S. at 128–37. As a result, the Supreme Court has observed, *Nishimura Ekiu* is not a reliable guide to the understanding of the "writ of habeas corpus as it was understood when the Constitution was adopted." *Id.* at 136. The Court therefore finds these precedents inapposite.[31]

---

[30] In 1948, the word "may" was added to the statute. It was only after 1948 that the statute was broadly construed to apply outside the criminal-law context, such as in immigration proceedings. *See* Lee Kovarsky, *The New Negative Habeas Equity*, 137 Harv. L. Rev. 2222, 2247 (2024).

[31] *Rasel v. Barr*, 455 F. Supp. 3d 38 (W.D.N.Y. 2020), on which respondents rely, is also inapposite. At issue there was a habeas petition challenging a noncitizen's ongoing detention

Here, by violating Funes' procedural due process rights, ICE caused Funes to be placed in custody. It is unknowable whether, had the proper procedure been followed and Funes been given a meaningful opportunity to respond and appeal to ICE's discretion, the same outcome would have followed. Funes is therefore today "in custody in violation of the Constitution." 28 U.S.C. § 2241(c)(3).

The Court accordingly finds that "dispos[ing] of the matter as law and justice require," requires Funes' release forthwith. 28 U.S.C. § 2243. That remedy aligns with numerous cases releasing habeas petitioners held in custody following procedural due process violations. *See, e.g., Zhu*, 2025 WL 2452352, at *9 (ordering release of noncitizen after finding breach of due process from failure to follow § 241.4(*l*)); *E.M.M*, 2025 WL 3077995, at *6 (same); *Ceesay*, 781 F. Supp. 3d at 145 (same); *Ramirez Lopez v. Trump*, 25 Civ. 4826 (S.D.N.Y. July 10, 2025), Dkt. 31 at 1–2 (same); *Lopez Benitez*, 2025 WL 2371588, at *9–10, 14–15 (ordering release of noncitizen for due process violation following detention under § 1226(a)); *Samb*, 2025 WL 2398831, at *3–4 (same); *Chipantiza-Sisalema*, 2025 WL 1927931 (same).

### 2.    Other Relief

Although Funes' submission is less than clear on these points, it appears to seek— beyond the issuance of a writ of habeas corpus ordering her immediate release—other relief. She appears to ask that the Court enjoin her future detention or transfer out of the New York area,

---

under 8 U.S.C. § 1226. The district court (Vilardo, J.) had denied an earlier habeas petition by the noncitizen, challenging his initial detention. *Id*. at 44. And the process remedy Judge Vilardo awarded in *Rasel* of a mandatory custody review and appeal of such by a specific date still included release. Judge Vilardo noted that if a custody review and appeal were not performed by a certain date, respondents were ordered to release Rasel. Far more apposite is Judge Vilardo's decision in *Ceesay*, a habeas action in which—based on a due process violation arising from ICE's failure to follow § 241.4(*l*)—he ordered the petitioner's release.

and declare that her future detention would violate due process.  Petition at 2, 13–14; Dkt. 8 at 26.  To the extent that Funes' requests seek relief beyond her immediate release, such relief would exceed the scope of the Court's authority.

As to a future decision to detain her, such decisions are appropriately committed to the executive branch, which—subject to compliance with applicable law—has substantial latitude in the execution of immigration enforcement decisions, *United States v. Texas*, 599 U.S. 670, 679 (2023), including as to noncitizens subject to orders of removal, *Garland v. Aleman Gonzalez*, 596 U.S. 543, 546–48 (2022); 8 U.S.C. § 1231; *see also Noem v. Vasquez Perdomo*, 2025 WL 2585637, at *5 (2025) (Kavanaugh, J., concurring) (it is not the place of courts to "step outside our constitutionally assigned role to improperly *restrict* reasonable Executive Branch enforcement of the immigration laws."  (emphasis in original)).  As Judge Vilardo recognized in *Ceesay*, that discretion would permit the government to re-detain a wrongly detained noncitizen following a successful habeas petition provided that, the next time, it does so "in a way that follows the rules."  781 F. Supp. 3d at 156;.

For much the same reason, the Court cannot now enjoin ICE, in the event of a future detention, from transferring Funes out of the New York area.  Pursuant to its broad enforcement authority, "the Government regularly transfers detained noncitizens between facilities, often multiple times."  *Garland*, 596 U.S. at 570 (Sotomayor, J., concurring in the judgment in part and dissenting in part); *see also Demore v. Kim*, 538 U.S. 510, 554 (2003) (Souter, J., concurring in part and dissenting in part) (immigration officials "detain, transfer, and isolate aliens away from their lawyers, witnesses, and evidence"); *Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434 (3d Cir. 2021).  In a particular case, there may be a factual basis to order a noncitizen's transfer to the district in which a habeas petition is pending, as was the case here to enable

Funes' live testimony. But a future detention of Funes would present a separate case with its own distinct circumstances. Any challenge to Funes' detention or transfer is properly left to the court hearing such a challenge.

## CONCLUSION

For the above reasons, the Court finds that ICE denied Funes due process in connection with the revocation of her order of supervision, and grants Funes' petition. The Court directs respondents to transport Funes back to this District and to release her from custody forthwith, by no later than noon on Tuesday, November 25, 2025. Promptly upon Funes' release, respondents are to file, on the docket of this case, a declaration certifying compliance with this Order.

The Clerk of Court is respectfully directed to terminate all pending motions.[32]

SO ORDERED.

Paul A. Engelmayer
PAUL A. ENGELMAYER
United States District Judge

Dated: November 24, 2025
       New York, New York

---

[32] Funes' petition claimed other violations of law arising from the revocation of her OSUP and from her alleged inability to access counsel while detained. Petition at 13. Because the relief Funes has obtained on her due process claim – immediate release from custody—is the same as or exceeds that to which she would have been entitled had she prevailed on those other claims, the Court denies these claims as moot.

51